## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **POCONO MEDICAL CENTER,** | : | **No. 3:10cv1334** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SEIU HEALTHCARE** | : | |
| **PENNSYLVANIA, CTW, CLC,** | : | |
| **Defendant** | : | |
| | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### MEMORANDUM

Before the court are the parties' motions for summary judgment. Having been fully briefed, the matters are ripe for disposition.

**Background**

This case arises from a dispute between the parties over an arbitration award. Plaintiff Pocono Medical Center ("PMC") and Defendant SEIU Healthcare are parties to a collective bargaining agreement. (Plaintiff's Statement of Material Facts (Doc. 21) (hereinafter "Plaintiff's Statement") at ¶ 1). That agreement contains a grievance procedure and an arbitration provision. (Id.). The grievance procedure and arbitration provision cover the termination of employment of members of the bargaining unit the defendant represents. (Id. at ¶ 2).

Darlene Cullen-Zen was a member of that bargaining unit. (Id. at ¶ 3). On or about March 23, 2009, plaintiff terminated Cullen-Zen's employment for violating plaintiff's workplace violence policy and procedures. (Id. at ¶ 4). Defendant SEIU

Healthcare filed a grievance on Cullen-Zen's behalf on March 23, 2009.  (Id. at ¶ 5).

The parties could not resolve this grievance, and they submitted the matter to

arbitration.  (Id. at ¶ 6).  Edward J. O'Connell served as the arbitrator.  (Id. at ¶ 7).

Arbitrator O'Connell held a hearing on December 18, 2009.  (Id. at ¶ 7).

O'Connell issued an award on May 24, 2010.  (Id. at ¶ 8).  This award sustained

defendant's grievance.  (Id.).  The award also converted Cullen-Zen's termination

into a disciplinary suspension running until the receipt of the award.  (Id.).  The

arbitrator's decision described the contractual provisions and workplace policies that

are the subject of the dispute here.  (Joint Appendix (Doc. 18) at 3-4).  Next, the

arbitrator described the incident that led to discipline against Cullen-Zell.  (Id. at 5).

Cullen-Zell had participated in a discussion among several of her coworkers in the

PMC phlebotomy department about a conflict in the workplace.  (Id.).  When one of

these coworkers attempted to leave the room, the arbitrator found, Cullen-Zell made

physical contact with her and used language the coworker found threatening.  (Id. at

12).

PMC argued that this behavior constituted a violation of the Center's "zero

tolerance" policy for workplace violence, and justified Cullen-Zell's termination.  The

arbitrator found, however, that reliance on the zero tolerance policy was "unavailing."

(Id. at 12).  The arbitrator pointed to Article 6.1 of the employment agreement, which

provides PMC the right to discharge any employee for just cause.  (Id. at 13).  Such

a right to firing for just cause, the arbitrator pointed out, "mandates that discipline is

to be imposed on a corrective basis."  (Id.).  The discipline described in Article 6.1 is

2

"corrective and punitive," but Article 6.2 provides that discipline "may, in appropriate circumstances, be progressive." (Id.). This concept of progressive discipline was one with which the parties who negotiated the contract "were conversant." (Id.).

The arbitrator noted that Cullen-Zell had not previously faced any discipline at the workplace. (Id.). Though the arbitrator acknowledged PMC"s "legitimate concerns about workplace violence" and noted that previous incidents of violence had resulted in termination, he also found that Cullen-Zell's grievance was "a first offense case in a collective bargaining setting." (Id.). Thus, "the severity of the punishment must meet the contractual just cause standard identified in Article 6, which refers to application of the principle of 'corrective' and 'progressive' discipline." (Id.). The arbitrator agreed that "there may be occasions when the conduct at issue is so egregious that immediate discharge might be appropriate under the contractual standards even without the application of progressive discipline." (Id.). The instant matter–which involved a contentious situation among coworkers in a confined space where emotions ran high–did not amount to such a situation. (Id.). The arbitrator found that Cullen-Zell's "conduct was not so outrageous that progressive discipline could be dispensed with and immediate discharge imposed." (Id.).

After rejecting Cullen-Zell's claim that her termination was a result of PMC's anti-union animus, the arbitrator concluded that she was entitled to reinstatement. He noted that "[e]xcept in rare cases, every employee has a right to be disciplined on a corrective or progressive basis where a contractual just cause provision exists." (Id. at 14). That right grows when the agreement references corrective action and

3

progressive discipline, as the agreement here does. (Id.).   Thus, even though PMC

had a "valid interest" in enforcing the zero-tolerance policy against an employee

whose "culpability has been established," the arbitrator found that Cullen-Zell's

"termination must be set aside as excessive and, consequently, as lacking just

cause grounds." (Id.).

Thereafter, plaintiff filed a complaint in this court seeking to vacate the award.

(Id. at ¶ 9).  Plaintiff argues that the arbitrator acted beyond the scope of his

authority under the labor contract.  (Id. at ¶ 9).  The arbitrator, plaintiff alleges,

improperly substituted his own judgment for the plaintiff's, adding and varying terms

of the labor contract.  (Id.).  The arbitrator also, plaintiff contends, issued an award

that did not draw its essence from the labor contract.  (Id.).  The defendant disputes

these conclusions about the arbitration award.  (Defendant's Counterstatement of

Material Facts (Doc. 24)).  The parties compiled a joint appendix containing the

record before the arbitrator, which they have submitted to this court.  (Plaintiff's

Statement at ¶ 11).

After the parties compiled this joint appendix, they filed the instant motions for

summary judgment and submitted briefs to the court, bringing the case to its present

posture.

**Jurisdiction**

Plaintiff brings the complaint pursuant to 29 U.S.C. § 185.  As such, the court

has jurisdiction pursuant to 28 U.S.C. § 1331.  ("The district courts shall have original

jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the

United States.").

**Legal Standard**

Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. International Raw Materials, Ltd. v. Stauffer Chemical Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. Anderson, 477 U.S. at 248 (1986). A fact is material when it might affect the outcome of the suit under the governing law. Id. Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex v. Catrett, 477 U.S. 317, 322 (1986).

The court's task here is to review an arbitration award.  "The Supreme Court has held that 'judicial review of a labor-arbitration pursuant to [a collective bargaining] agreement is very limited.'" Nat'l Ass'n of Letter Carriers v. United Stats Postal Serv., 272 F.3d 182, 185 (3d Cir. 2001) (quoting Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504 (2001)).  A court's "role in reviewing the outcome of the arbitration proceedings is not to correct factual or legal errors made by an arbitrator."  Major League Umpires Ass'n v. Am. League of Prof'l Baseball Clubs, 357 F.3d 272, 279 (3d Cir. 2004).  Thus, a court "should uphold an arbitration award that 'draws its essence from the collective bargaining agreement' because 'the parties to the collective bargaining agreement 'bargained for' a procedure in which an arbitrator would interpret the agreement.'" Id. (quoting National Ass'n of Letter Carriers, 272 F.3d at 185).

"'An arbitration award draws its essence from the bargaining agreement if 'the interpretation can *in any rational way* be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention.'" United Trans. Union Local 1589 v. Suburban Transit Corp., 51 F.3d 376, 379-380 (3d Cir. 1995) (quoting Tanoma Min. Co., Inc. v. Local Union No. 1269, UMWA, 896 F.2d 745, 748 (3d Cir. 1969)) (emphasis in original).  Moreover, "arbitration awards enjoy a strong presumption of correctness that may be overcome only in certain limited circumstances."  Major League Umpires Ass'n, 357 F.3d at 280.  Awards "may be vacated if the arbitrator demonstrates manifest disregard for the CBA," which "is established when the arbitrator's award is 'totally unsupported by principles

of contract construction.'" Id. (quoting Exxon Shipping Co. v. Exxon Seamen's Union,

993 F.2d 357, 360 (3d Cir. 1993)).  A court may also vacate an award "if the

arbitrator's interpretation . . . was 'contrary to public policy'" or if "the arbitrator has

ignored the plain language of the collective bargaining agreement."  Nat'l Ass'n of

Letter Carriers, 272 F.3d at 185-186 (quoting E. Associated Coal Corp. V. Mine

Workers, 531 U.S. 57, 62 (2000).  Still, "[t]he decision is subject to a standard of only

minimal rationality.'"  Citgo Asphalt Ref. Co. v. Paper, Allied-Industrial, Chem. &

Energery Workers International Union, 385 F.3d 809, 816 (3d Cir. 2004)

**Discussion**

The parties disagree about the need to vacate the arbitrator's award.  Plaintiff

Pocono Medical Center argues that the arbitrator ignored the express provisions of

the parties' contract.  Pocono Medical Center has an express "zero tolerance policy"

regarding workplace violence, and the arbitrator's decision to overturn Cullen-Zen's

termination ignored PMC's contractual right to establish workplace rules, regulations

and policies.  Instead, the arbitrator inserted a progressive discipline policy into the

contract's terms that the parties had not negotiated to use.  PMC also argues that

the arbitrator "eviscerated" the Center's zero tolerance policy, grafting a just cause

requirement onto that policy.  Alternatively, PMC argues that Cullen-Zel's conduct

violated well-established standards for workplace conduct and the Center did not

need to rely on any contractual provision to justify her termination.

Defendant SEIU Healthcare likewise seeks summary judgment, arguing that

arbitrator's award should be sustained.  The union contends that the arbitrator's

decision draws its essence from the collective bargaining agreement.  The contract's language requires just cause for termination, and "fleshes out" that standard by requiring corrective and progressive discipline.  The arbitrator's decision followed those contractual principles and carried out his appointed duty: to determine whether there was just cause for Cullen-Zell's termination and, if not, what the appropriate discipline for her behavior should be.

The parties have submitted a copy of the collective bargaining agreement ("CBA") as part of their joint appendix.  At issue here are several provisions.  Article 3.1 of the CBA establishes that "[e]xcept where expressly abridged by a specific provision of this Agreement, the Medical Center retains the sole and exclusive right to manage all operations of the Medical Center, including but not limited to: hire, discipline, demote, suspend or discharge . . . employees."  (Joint Appexndix at 21).  Article 6 of the Collective Bargaining Agreement addresses discipline and discharge. (Joint Appendix at 25).  Article 6.1 provides that "[t]he Medical Center shall have the right to discharge, suspend or discipline any employee for just cause."  (Id.).  That article also establishes that "the Medical Center has the right to implement and enforce work rules, policies and procedures."  (Id.).  Under the agreement, "discipline is corrective and punitive and . . . will not be applied arbitrarily or capriciously."  (Id.). Further, Article 6.2 provides that "[d]isciplinary actions shall be determined in relation to the seriousness of the offense and may, in appropriate circumstances, be progressive."  (Id.).  The record also indicates that PMC established a "Workplace Violence Management Plan."  That plan provides that "the organization maintains a

8

'zero tolerance' policy for perceived or actual threats or acts of intentional violence against our staff, physicians, patients and visitors[.]" (Id. at 93).   Finally, PMC established a "Code of Ethics & Organizational Integrity Guidelines."  (Id. at 116). That Code provides that "[w]orkplace violence, or other threatening conduct such as stalking, robbery, assault, battery, vandalism, harassment and other threats and crimes committed by current or former employees, medical staff appointees, other associates, or their accomplices is not acceptable and will not be tolerated."  (Id.).

PMC argues that the arbitrator's decision "completely eviscerated PMC's zero tolerance policy, effectively declaring such polices unenforceable in the face of a 'just cause' provision."  The parties' agreement gave PMC the sole and exclusive right to establish workplace rules, regulations and policies; allowing the arbitrator to void the zero tolerance rule by citing to just cause provisions in the contract undermines that agreement.  The plaintiff cites to the Third Circuit's opinion in CITGO Asphalt Ref. Co. v. Paper, Allied-Industrial, Chem. & Energery Workers International Union, 385 F.3d 809 (3d Cir. 2004), for the proposition that zero tolerance policies are valid in the collective bargaining context.  In CITGO, the plaintiff had announced plans to "implement a new uniform national substance abuse policy, which included a zero tolerance policy."  Id. at 811.  The defendant union challenged implementation of this policy at a plant in Paulsboro, New Jersey.  Id. The union's grievance argued that CITGO had violated the collective bargaining agreement by failing to bargain over the implementation of a new drug and alcohol policy and that the policy instituted by CITGO was unreasonable.   Id.  The arbitrator

concluded that no breach of the CBA occurred when Citgo unilaterally implemented the new drug policy.  Id. at 814. He found, however, that the company's zero tolerance policy was unreasonable, as the policy did not provide "a second chance for rehabilitation."  Id.

The Court of Appeals concluded that the arbitrator's award did not draw its essence from the collective bargaining agreement.  Id. at 816.  The arbitrator "ignored the parameters of his inquiry as defined by the CBA."  Id. at 817.  The agreement stated that "'the arbitrator shall not substitute his judgment for that of the Company in the absence of a clear abuse of discretion.'"  Id.  Thus, he "could therefore only conclude that the zero tolerance policy was unreasonable if he found that CITGO clearly abused its discretion in instituting it."  Id.  The arbitrator found no such abuse of discretion, but "simply substituted his own judgment for CITGO's and declared CITGO's zero tolerance provision unreasonable."  Id.  Since this opinion was based on principles of fairness and equity rather than on the agreement, the court found that the award "fail[ed] to derive its essence from the CBA."  Id.

The facts in this case are different.  In CITGO, the dispute was over whether the zero tolerance policy–which mandated firing for certain violations–was itself proper.  The parties did not dispute that termination was the appropriate action if the zero tolerance policy itself existed.  Here, the arbitrator here did not rule that the plaintiff's zero tolerance policy was invalid.  The union's grievance did not challenge the existence of the policy, but instead challenged the ability of the employer to terminate Cullen-Zell's employment, even with a zero tolerance policy in place.  The

arbitrator arguably grounded his opinion in the terms of the contract explained above, which require just cause for firing and allow for progressive discipline and mandate that any discipline be applied in a considered, not arbitrary, fashion.  He cited to those provisions of the contract and did not replace his own sense of fairness and equity for the contractual terms.  Most important, unlike the CITGO policy, PMC's zero-tolerance policy does not expressly state that termination is the only discipline available under the zero-tolerance policy.

The court disagrees with PMC's contention that the arbitrator ignored the "zero tolerance policy" in rendering his decision and that his decision somehow declared the policy invalid.  The zero tolerance policy establishes that the company will not tolerate any violence in the workplace, but nowhere does that policy state that the penalty for violation of the policy is automatic termination.  Without such explicit authorization, the court cannot conclude that the arbitrator ignored the parties' intentions or disregarded the terms of the contract for his own sense of industrial justice.  Plaintiff appears to contend that "zero tolerance" can only be interpreted as "requiring immediate termination."  Nowhere in the policies and documents cited by PMC, however, is "zero tolerance" defined.   Thus, the arbitrator's conclusion that "zero tolerance" required punishment but not termination is not completely unsupported by the language of the contract and the context in which the parties created it.   As a matter of logic, "zero tolerance" can mean that any violation will provoke some punishment, but not necessarily termination.  Moreover, the arbitrator did not declare that the alleged zero tolerance policy itself was inappropriate and

11

should be removed from the contract.  He simply concluded that termination was an inappropriate punishment given the facts of the case.

Some evidence in the case indicates that prior to the existence of the collective bargaining agreement the penalty for violation of the zero-tolerance policy was termination.   Whatever position the employer took prior to the agreement between the parties, the arbitrator found that the terms of the contract allowed for a different form of discipline for violation of the zero tolerance policy.  The arbitrator's position here is not contrary to public policy, nor is his reading of the CBA's terms totally contrary to any established principle of contract construction.  The arbitrator did not ignore the "zero tolerance" policy PMC established, but interpreted the discipline available under that policy through the lens of other contractual provisions.  This reading does not completely disregard the plain language of the contract, but instead is rationally derived from it.  The award therefore draws it essence from the collective bargaining agreement.  See, e.g., Merck & Co. v. Allied-Industrial, Chem. & Energy Workers, 246 Fed. Appx. 97, 99-100 (3d Cir. 2007) (an award draws its essence from the CBA 'if the interpretation can in any rational way be derived from the agreement.'")(quoting Ludwig Honold Mfg. Co. v. Fletcher, 405 F.2d 1123, 1128 (3d Cir. 1969)).  The court will therefore decline to vacate the award on these grounds.[1]

---

[1]The court also rejects PMC's contention that the arbitrator ignored the terms of the contract because Article 3.1 of the CBA establishes that PMC has the "sole and exclusive right to manage all operations of the Medical Center, including but not limited to: hire, discipline, demote, suspend or discharge . . . employees."  While that provision of the contract exists, the provision is prefaced by the statement that the section applies "[e]xcept

As alternate grounds for vacating the award, PMC argues that the an employer's legal obligation to secure the safety of employees required termination of Cullen-Zell. Arbitrators have discharged employees for fighting on a first offense, and the sort of conduct in which Cullen-Zell engaged is so inherently improper that no explicit rule is necessary to justify termination.

PMC points to language from the arbitrator's decision to argue that the decision ignored the terms of the contract and the zero tolerance policy, transforming the policy into one that "applies only to unprovoked physical assaults against supervisors." The arbitrator concluded that "there may be occasions when [an employee's] conduct is so egregious that immediate discharge may be appropriate under the contractual standards even without the application of progressive discipline." (Joint Appendix at 13). He pointed out that "examples of such egregious misconduct could include intentional patient abuse in a healthcare setting, or an unprovoked physical assault on a supervisor." (Id.). The court is unpersuaded by this reasoning. The arbitrator's conclusions are phrased as examples and possibilities, not limiting rules of law. The arbitrator's purpose here was clearly to establish that he read the contract to provide that some conduct–such as the Cullen-Zell's behavior in this case–could qualify as inappropriate but not liable to termination while other, worse, conduct might require termination. This position is

---

where expressly abridged by a specific provision of this Agreement." A reading of the contract to conclude that Articles 6.1 and 6.2 expressly abridge this power when it comes to discipline and termination is not manifestly unreasonable or beyond all bounds of contract interpretation. As such, there are no grounds to vacate the award based on Article 3.1.

13

not unreasonable, nor contrary to the terms of a contract that allows for progressive discipline as appropriate.  The parties bargained for arbitration in employment disputes, and the arbitrator applied the contract to the facts at hand.  The court will not vacate the award on these grounds.

**Conclusion**

Because the court finds that the arbitrator's decision draws its essence from the collective bargaining agreement, the court will not vacate the decision.  The court will deny the plaintiff's motion for summary judgment and grant the defendant's.  An appropriate order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **POCONO MEDICAL CENTER,** | : | No. 3:10cv1334 |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SEIU HEALTHCARE** | : | |
| **PENNSYLVANIA, CTW, CLC,** | : | |
| **Defendant** | : | |
| | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### ORDER

**AND NOW,** to wit, this 14th day of July 2011, the defendant's motion for summary judgment (Doc. 17) is hereby **GRANTED**. The plaintiff's motion for summary judgment (Doc. 21) is hereby **DENIED**. The Clerk of Court is directed to **CLOSE** the case.

**BY THE COURT:**

**s/ James M. Munley**
**JUDGE JAMES M. MUNLEY**
**United States District Court**